**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| AMERICAN HOME ASSURANCE | § | |
| COMPANY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3692 |
| | § | |
| CAT TECH, L.L.C., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This is an insurance coverage dispute between Cat Tech, LLC and its commercial general liability and umbrella insurers, American Home Assurance Company and National Union Fire Insurance Company of Pittsburgh, PA. The dispute is over the insurers' duty to indemnify Cat Tech for an arbitration award in favor of its client, Ergon Refining, Inc., arising from catalyst change-out services Cat Tech provided on a reactor at Ergon's refinery. The arbitrators found Cat Tech responsible for damage to the reactor that Cat Tech worked on twice, in January and in February 2005. American Home paid Cat Tech $1 million, the per occurrence policy limit, subject to a reservation of rights. In this suit, the insurers seek a declaratory judgment that they have no duty to indemnify Cat Tech for the over $1.9 million in damages awarded Ergon in the arbitration. Cat Tech has counterclaimed for a declaratory judgment that it is entitled to indemnity for the total arbitration award.

The following motions are pending:

• American Home and National Union have moved for summary judgment, arguing that exclusions in their policies apply to preclude any duty to indemnify Cat Tech for the

arbitration award.  (Docket Entry No. 57).  Cat Tech has responded and cross-moved for summary judgment that the insurance policies cover the damages awarded in the arbitration. (Docket Entry No. 60).  The plaintiffs have replied, (Docket Entry No. 62), and Cat Tech has replied in support of its cross-motion, (Docket Entry No. 63).

- Cat Tech has filed a motion for partial summary judgment, (Docket Entry No. 37), which it later amended, (Docket Entry No. 41), seeking a judgment that there were two covered "occurrences."  The plaintiffs have responded, (Docket Entry No. 47), and Cat Tech has replied, (Docket Entry No. 53).

- Cat Tech has filed another motion for partial summary judgment that the arbitration award is for "property damage" covered under the American Home and National Union policies. (Docket Entry Nos. 43-46).  The plaintiffs have responded,  (Docket Entry No. 47), and Cat Tech has replied, (Docket Entry No. 53).

- Cat Tech has moved to strike the testimony of Christopher Martin, a testifying expert retained by the plaintiffs on insurance coverage and claims handling issues.  The plaintiffs have responded.  (Docket Entry No. 42)  Cat Tech has replied, (Docket Entry No. 48), the plaintiffs have filed a surreply, (Docket Entry No. 51), and Cat Tech has filed a second reply, (Docket Entry No. 52).

- Cat Tech has also moved to strike the expert testimony of Dr. Christopher Buehler, who testified about Cat Tech's work and the damage to the Ergon reactor.  (Docket Entry Nos. 42, 50).  The plaintiffs have responded.  (Docket Entry No. 54).[1]

---

[1]  Cat Tech has also moved for oral argument on the pending motions.  (Docket Entry No. 56).  Because this opinion disposes of all the pending motions, the motion for argument is denied as moot.

Based on the motions, responses, and replies; the record; the pleadings; and the applicable law, this court rules as follows:

- The plaintiffs' motion for summary judgment is granted.  The plaintiffs have no duty to indemnify Cat Tech for the arbitration award.

- Cat Tech's motions for partial summary judgment are denied as moot.

- Cat Tech's motion to exclude Martin's expert testimony is granted in part and denied in part and its motion to exclude Buehler's expert testimony is denied.

By **June 25, 2010**, the parties must submit a statement identifying any issues that remain to be decided and proposing a scheduling order for resolving them or proposing an order of final judgment.

The reasons for these rulings are explained below.

## I.    Background

### A.    The Arbitration

Ergon Refining, Inc. hired Cat Tech to service a reactor at Ergon's Vicksburg, Mississippi refinery.  On October 8, 2004, Cat Tech and Ergon entered into a Master Service Contract.  In January 2005, during a planned turn-around, Cat Tech performed catalyst change-out service work on the "D-651 hydrotreating reactor" at the Ergon refinery.  (Docket Entry No. 57, Ex. 1 at 1).  The work on the reactor led to Ergon's claim for breach of contract and negligence against Cat Tech. The arbitrators heard six days of evidence and arguments.  In a "reasoned" award, the arbitrators found that Ergon was entitled to recover $1,973,180.00 for direct damages, interest, and attorney's fees and litigation expenses from Cat Tech.  The arbitrators found that the contract precluded consequential damages.  (Docket Entry No. 57, Ex. 1 at 1).

3

In the award, the arbitrators found that "Cat Tech's scope of work . . . consisted of unloading all catalyst from Beds 1 through 4, removal of existing reactor internals, installation of new reactor internals, and the loading of new catalyst in each of the Beds."  (Docket Entry No. 57, Ex. 1 at 2). The arbitrators entered the following findings:

> II.    Event 1 – January 2005
>
> . . . After the completion of Cat Tech's work, Ergon began the start-up process of the reactor.  During the start-up process, a high pressure drop in the lower section of the reactor became manifest, and the reactor was subsequently shut down.  Upon entry of the reactor in February 2005, among other things, significant damage was discovered to the Bed 3 reactor internals.
>
> At the hearing, extensive evidence was presented on this issue, particularly with respect to the rope packing around the Bed 3 Johnson screens. The parties' witnesses, including experts, presented different theories of how the reactor internals may have been damaged.  There were conflicting opinions regarding whether the rope packing was properly installed by Cat Tech or whether the start-up process somehow dislodged the rope packing.  There were also disputed positions regarding the level of inspection or oversight of Cat Tech's work which Ergon should have provided.
>
> Based upon the evidence and arguments of the parties, the arbitrators find Cat Tech failed to properly place the rope packing around the Bed 3 Johnson screens which, among other things, caused the damage to the Bed 3 reactor internals, migration of catalyst from Bed 3 into Bed 4, and damage to some of the catalyst.  The arbitrators further find that Ergon is not contractually liable for failing to catch Cat Tech's errors; however, the arbitrators note that Ergon's approach to this work is not without criticism for failing to recognize that more proactive quality control was necessary for this critical work.  The damages recoverable for this event are addressed below.
>
> III.    Event 2 – February 2005
>
> As mentioned above, the reactor was shut down in February 2005 to address Event 1.  For this shutdown, Cat Tech unloaded catalyst from Beds 1, 2, 3 and part of Bed 4; Cat Tech screened the

4

removed catalyst; Cat Tech removed the damaged reactor internals and reinstalled the repaired internals; and Cat Tech loaded the screened catalyst along with a limited amount of new catalyst to make up for [] the amounts lost in the screening process.  After this work was completed, a large pressure drop developed in Bed 3 during the start-up process.  However, the reactor was not shutdown to address the pressure drop issue until October 2005.  Ergon also did not request Cat Tech to perform the October 2005 work and, instead, employed a different contractor.

At the hearing, the parties' witnesses, including experts, presented different theories of the cause of the Bed 3 pressure drop, particularly with respect to the Bed 3 catalyst loaded by Cat Tech. There were conflicting opinions regarding whether the pressure drop may have been caused by a thin layer of dust/fines in Bed 3, whether the pressure drop may have been caused by an interface between screened and new catalyst, or whether the pressure drop may have been caused by some other unknown occurrence.  While there was considerable evidence presented by both parties on this issue, much of the evidence was circumstantial.  Due to various circumstances, there was limited evidence by either party of any physical testing or analysis of the material allegedly comprising the thin layer of fines. Also, there was no definitive evidence of how those fines may have found its [sic] way into the reactor.

Nevertheless, based upon a preponderance of the evidence, the arbitrators find Cat Tech is responsible for the excessive pressure drop in Bed 3.  The evidence shows that the excessive pressure drop in Bed 3 was evident at the beginning of start-up for this event.  Cat Tech was solely in control of the screening of the catalyst and the loading of the catalyst in the reactor.  The damages recoverable for this event are addressed below.

(*Id.* at 2-3).  The arbitrators awarded $750,000 in damages for "event 1" and $1 million in damages for "event 2."  (*Id.*, Ex. 1 at 5).

Dr. Christopher Buehler, a chemical engineer retained by the plaintiffs as an expert witness in this coverage dispute, described the part of the reactor that Cat Tech was working on.[2]  The

---

[2]   As explained later in this opinion, Cat Tech's motion to exclude this witness is overruled.

reactor contained four "beds," with Bed 1 on the top and Bed 4 on the bottom.  Each bed was loaded with catalyst.  On top of the catalyst in each bed was a distribution tray and a quench assembly. Below Bed 4 was the reactor vessel and "support grid."  (Docket Entry No. 59, Ex. 1 at 4).  Cat Tech removed the distribution trays and quench assemblies and unloaded the catalyst.  As this work proceeded, the support grid was exposed and was inspected.  The outlet screen at the bottom of the reactor vessel was removed and replaced, followed by the replacement of the "support spheres." Next, Cat Tech began loading new catalyst into the beds.  "Once the bed height reached a few feet below the location of a given distribution tray, catalyst loading was stopped.  Fire blankets and plywood were then laid on top of the catalyst to create a work platform for distribution tray and quench assembly installation.  Then, the work platform materials were removed, additional catalyst was sock loaded to bring the bed to its final height, and the periphery of the support grid above the quench assembly was sealed with rope gasket."  (Docket Entry No. 59, Ex. 1 at 4).  After the rope gasket seal was applied, the inert support spheres and the catalyst were loaded onto all four beds and their internal components were installed.  (*Id*.).  Inspectors from the designers of the distribution trays and quench assemblies inspected these components during the process.  (*Id*.).

The turnaround work was completed on January 27.  When Ergon began starting up the reactor and reintroduced oil, "a high pressure drop in the lower section of the reactor became manifest."  (Docket Entry No. 57, Ex. 1 at 3).  The reactor was shut down in early February to allow Ergon to investigate the cause of the unusually high differential pressure.  In February 2005, Ergon called Cat Tech again to address this problem.  During this February 2005 reactor shut down, "Cat Tech unloaded catalyst from Beds 1, 2, 3 and part of Bed 4; Cat Tech screened the removed catalyst; Cat Tech removed the damaged reactor internals and reinstalled the repaired internals; and Cat Tech

6

loaded the screened catalyst along with a limited amount of new catalyst to make up for [] the amounts lost in the screening process." (Docket Entry No. 57, Ex. 1 at 2). After Cat Tech finished this work, Ergon started up the reactor and observed a large pressure drop in Bed 3. Ergon was able to continue operating the reactor but had to use reduced production rates on the heaviest feedstock until the repairs could be made. That occurred in October 2005, using a new contractor to perform the work.

Ergon presented evidence at the arbitration that the rope gasket Cat Tech used to seal Bed 3 had been improperly installed, allowing catalyst the support spheres located at the bottom of Bed 3 to migrate. Cat Tech presented expert testimony that this damage to catalyst Bed 3 was caused by the start-up process after Cat Tech's work was finished. There was conflicting evidence as to whether the pressure drop in January 2005 was caused by a layer of dust or larger particles called "fines," in Bed 3, the interaction between screened and new catalyst, or "some other unknown occurrence." Although the arbitrators could not make a conclusive determination of the cause for the January 2005 shutdown and damage, they did conclude that Cat Tech had improperly "placed the rope packing around the Bed 3 Johnson screens which, among other things, caused the damage to the Bed 3 reactor internals, migration of catalyst from Bed 3 into Bed 4, and damage to some of the catalyst." (Docket Entry No. 57, Ex. 1 at 3). According to Buehler, the damage to the reactor internals included that one side of Bed 3 "had slumped approximately 4 feet" and that in Bed 4, "components of the distribution and quench trays were damaged such that the support beams were deformed by approximately 3 inches in the downward direction." (Docket Entry No. 59, Ex. 1 at 5-6). The arbitrators also concluded that Cat Tech was responsible for the February 2005 pressure drop in Bed 3 because it was in evidence when the start-up began and Cat Tech was "solely in

control of the screening of the catalyst and the loading of the catalyst in the reactor." (Docket Entry No. 59 at 3).

The arbitration panel awarded Ergon $750,000 in direct damages for the January 2005 "event" and $1,000,000 for the February 2005 "event."  The panel awarded Ergon less than the amounts it had claimed "largely due to what the arbitrators believe  to be excessive charges for Ergon engineers who were involved in the work." (*Id.* at 4).  The panel reduced the damages for the second event further because of "excessive charges for catalyst." (*Id.*).  The panel also awarded Cat Tech an offset of $368,500, the unpaid  contract price for the January work it had performed.  (*Id.*). Cat Tech was also ordered to pay prejudgment interest and $300,000 in attorney's fees for a net award to Ergon of $1,973,180.00. (*Id.* at 5).

**B.    The Policies**

When Cat Tech performed its work at the Ergon refinery, it was a named insured in two insurance policies.  The first was commercial general liability policy GL 477-06-67 issued by American Home, which provided up to $1 million of coverage per occurrence, up to $2 million of total coverage other than for "Products-Completed Operations," and up to $2 million of total coverage for "Products-Competed Operations." (Docket Entry No. 57, Ex. 2 at 14).  The second was commercial umbrella policy BE 164-82-55, issued by National Union, which provided coverage upon exhaustion of primary insurance, up to $10 million per occurrence, up to $10 million in the aggregate other than "Products-Completed Operations," and up to $10 million total for "Products-Completed Operations."  (*Id.*, Ex. 3 at 80).  The American Home policy had effective dates from November 30, 2004 to November 30, 2005; the National Union policy had effective dates after an

endorsement from May 1, 2004 to July 1, 2005.  The relevant terms in both policies are very similar.

For the sake of simplicity, only one policy is quoted, with any material differences noted.

The policies provided coverage for "bodily injury" or "property damage" caused by an

"occurrence."  (*Id.*, Exs. 2 at 21; 3 at 127).  "Property Damage" is defined in relevant part as:

> a.    Physical injury to tangible property, including all resulting
>       loss of use of that property.  All such loss of use shall be
>       deemed to occur at the time of the physical injury that caused
>       it; or
>
> b.    Loss of use of tangible property that is not physically injured.
>       All such loss of use shall be deemed to occur at the time of
>       the "occurrence" that caused it.

(*Id.*, Exs. 2 at 35; 3 at 147-48).

American Home and National Union argue that the "your product" and "your work"

exclusions in the policies bar coverage for the arbitration award.  Exclusion K in the American

Home policy and Exclusion F in the National Union policy exclude coverage for "'property damage'

to 'your product' arising out of it or any part of it."  Exclusion L in the American Home policy and

Exclusion G in the National Union policy preclude coverage for "'property damage' to 'your work'

arising out of it or any part of it and included in the 'products-completed operations hazard.'"

The exclusions state as follows:

> **2. Exclusions**
>
> This insurance does not apply to:
> . . .
>
> **k. Damage To Your Product**
>
> "Property damage" to "your product" arising out of it or any
> part of it.

**l.  Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(*Id.*, Exs. 2 at 22-25; 3 at 132).

In Exclusion K, "Your product" is defined as

(1)    "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by . . . (a) You . . . .

"Your product" is defined to include:

(1)    "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product'";

(2)    The providing of or failure to provide warnings or instructions.

"Your product" is defined to exclude "vending machines or other property rented to or located for the use of others but not sold."  (*Id.*, Exs. 2 at 35-36; 3 at 148-49).

In Exclusion L, "Your work" is defined to mean:  "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations," including warranties or representations about "your work."  (*Id.*, Exs. 2 at 36; 3 at 149).

The "Products-Completed Operations Hazard" is defined to include:

a.    [A]ll "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your possession; or

10

(2) Work that has not yet been completed or abandoned.

(*Id.*, Exs. 2 at 35; 3 at 147).

Work is deemed completed under the policies at the earliest of three times: (1) when the work called for in the contract is completed; (2) when all the work called for at a particular job site is completed; or (3) when "that part of the work done at a job site has been put to its intended use" by someone other than the insured or another contractor.  (*Id.*).  "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."  (*Id.*).[3]

American Home defended Cat Tech in the underlying arbitration "under reservation of rights."  (Docket Entry No. 57 at 2).  American Home agreed to pay $1 million, the per occurrence policy limit, subject to the reservation of rights.  After the arbitration panel issued its award, Cat Tech sought indemnity from American Home and National Union.  American Home and National Union have not agreed to pay the balance of the award and both seek a declaration that they owe no duty to indemnify Cat Tech as to that award because the exclusions mean that the policies do not

---

[3]   The final section of the products-completed operations hazard definition states that it does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

(*Id.*).

cover the award.  American Home does not "[a]t this time" seek reimbursement of the $1 million it paid on behalf of Cat Tech for what it termed the "uncovered claim."  (Docket Entry No. 47 at 6 n.1).  At the same time, American Home and National Union vigorously dispute that any inference of coverage can be drawn from its payment during settlement efforts and subject to a reservation of rights.

### C.    The Coverage Litigation

On December 18, 2008, American Home and National Union filed this suit seeking a declaratory judgment that (1) the damages awarded in the arbitration arose out of a single "occurrence" and (2) the National Union umbrella policy did not provide coverage for the claims against Cat Tech.  (Docket Entry No. 1).  The insurers have amended their complaint twice.  The current complaint seeks a declaratory judgment that based on the "your product" and "your work" exclusions, "American Home and National Union owe no duty to indemnify Cat Tech against the underlying arbitration award."  (Docket Entry No. 35 at 11).  Cat Tech has counterclaimed for a declaratory judgment that there were two covered occurrences or, if there was only one occurrence, that the National Union umbrella policy "has been triggered and provides coverage."  (Docket Entry No. 38 at 5).  Cat Tech has also counterclaimed for breach of contract, violation of certain provisions of the Texas Insurance Code based on bad faith and misrepresentation, and bad faith under Texas common law.  (Docket Entry No. 9).

Cat Tech has moved to strike two of the plaintiffs' proposed expert witnesses: Christopher Martin, who testified about insurance issues, and Dr. Christopher Buehler, who testified about the technology and the work Cat Tech performed. (Docket Entry Nos. 42, 50).  The plaintiffs have responded to both motions.  (Docket Entry Nos. 48, 54).  Cat Tech replied in support of its motion

to exclude Martin, (Docket Entry No. 49), the plaintiffs filed a surreply, (Docket Entry No. 51), and

Cat Tech filed a second reply, (Docket Entry No. 52).

On December 8, 2009, Cat Tech filed a motion for partial summary judgment, (Docket Entry

No. 37), which it amended on December 24, 2009, (Docket Entry No. 41).  This motion seeks a

declaratory judgment that there were two occurrences under the policy, triggering the policy limit

of $ 2 million.  Cat Tech filed another motion for partial summary judgment on December 31, 2009,

seeking a declaratory judgment that the arbitration award was for "property damage" covered under

the American Home and National Union policies.  (Docket Entry Nos. 43-46).  The plaintiffs

responded to both motions together.  (Docket Entry No. 47).  Cat Tech replied.  (Docket Entry No.

53).  On March 17, 2010, American Home and National Union moved for summary judgment,

arguing that the "your product" and "your work" exclusions precluded any duty to indemnify Cat

Tech for the arbitration award.  (Docket Entry No. 57).  Cat Tech responded and cross-moved for

summary judgment that there is coverage under the "products completed-operations hazard" policy

provision for the damage arising out of Cat Tech's work.  (Docket Entry No. 60).  The plaintiffs

replied, (Docket Entry No. 62), and Cat Tech replied in support of its cross-motion, (Docket Entry

No. 63).

The motions and responses are considered below.

## II.    Cat Tech's Motions to Strike the Designated Expert Testimony

Cat Tech has moved to strike the expert testimony of Christopher Martin, an attorney who

provided an expert report about the insurance coverage issues, and Dr. Christopher Buehler, an

engineer who provided an expert report about Cat Tech's work on the reactor and the damage to the

reactor.  Cat Tech argues that Martin's testimony improperly states legal conclusions and that

Buehler's testimony is not helpful to the fact finder because it merely recites testimony presented in the underlying arbitration.  Cat Tech does not challenge the qualifications of either expert.

### A.     The Applicable Law

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S. Ct. 1167 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 S. Ct. 2786 (1993).  Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education. FED. R. EVID. 702.  The court must determine whether the proposed expert's training or experience is sufficiently related to the issues and evidence before the court that the testimony will assist the trier of fact.  *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562-63 (5th Cir. 2004).  The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc).

### B.     Christopher Martin's Testimony

Martin's Rule 26 report primarily addresses how this court should interpret the insurance policies.  (Docket Entry No. 48, Ex. 2).  Martin is a recognized expert on legal issues of insurance coverage.  His  report is in essence a legal brief.  He states opinions on the number of "occurrences"

14

under the properly interpreted and applied policy definition of the term; the applicability of policy exclusions; whether the contract was breached; and whether there is evidence of misrepresentation, waiver of defenses; or presence of bad faith, malicious action, or negligent conduct.  Although expert opinions are not inadmissible merely because they "embrace" ultimate issues to be decided by the trier of fact, FED. R. EVID. 704, legal conclusions or statements of advocacy do not assist the factfinder.  *Snap-Drape, Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194, 197-98 (5th Cir. 1996).  Despite its permissive language, Rule 704 "does not allow an expert to render conclusions of law."  *Id.*  Most of Martin's report is inadmissible on this basis.

To the extent Martin's report addresses contract interpretation, it is inadmissible.  Expert testimony on the proper interpretation of contract terms may be admissible when the meaning depends on trade or industry practice.  *See*, *e.g.*, *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (holding that the district court properly admitted expert testimony to interpret contract provisions having a specialized meaning in the railroad industry).  But such expert testimony is admissible only if the contract language is ambiguous or involves a specialized term of art, science, or trade.  *See Sheet Metal Workers*, *Int'l Assn*, *Local Union No. 24 v. Architectural Metal Works*, *Inc.*, 259 F.3d 418, 424 n. 4 (6th Cir. 2001) ("[T]he construction of unambiguous contract terms is strictly a judicial function; the opinions of percipient or expert witnesses regarding the meaning(s) of contractual provisions are irrelevant and hence inadmissible."); *Phillips Oil Co. v. OKC Corporation*, 812 F.2d 265, 279-80 (5th Cir.) *cert. denied*, 484 U.S. 851, 108 S.Ct. 152 (1987) (affirming the trial court's admission of expert testimony to explain accounting provisions of unambiguous farmout agreement, because those provisions had a specialized usage and meaning within the oil and gas industry).  In the present case, no party argues that the relevant policy terms

15

are ambiguous.  The specialized insurance terms are defined within the policy.  There is no need for expert testimony to explain the meaning of the insurance policies.

To the extent that Martin's testimony explains bears on claims handling and what generally constitutes bad faith within the insurance industry, it is admissible.  Cat Tech has not challenged Martin's qualifications on this (or any other) point, and such testimony could be helpful to a trier of fact called on to decide counterclaims for bad faith and violation of the Texas Insurance Code. *See, e.g., Cedar Hill Hardware & Constr. Supply, Inc. v. Insurance Corp. of Hanover*, 563 F.3d 329, 343-44 (8th Cir. 2009) (denying a motion to exclude an expert witness testifying "generally as to underwriting standards, the materiality of mortgage information on underwriting decisions, and proper claims handling," and specifically as to claims handling in the case before the court). Because the only issues addressed in this opinion relate only to coverage, however, none of Martin's testimony is considered.[4]

### C.      Dr. Christopher Buehler's Testimony

Buehler's report explains the underlying events at the Ergon refinery with more detail and specificity than the arbitration award.  The report also sets forth the following six statements:

- Ergon contacted Cat Tech to perform work within HPU reactor D-651 during the January 2005 turnaround.  The work included unloading the catalyst, removing the distribution

---

[4]  Cat Tech's argument that Martin's testimony should be stricken because the plaintiffs ignored requests to schedule Martin's deposition until after Cat Tech's deadline to designate experts had passed is both moot and unpersuasive. The Federal Rules of Civil Procedure allow a party to move for an extension of deadlines for expert designations on a showing of good cause. FED. R. CIV. P. 16.  Cat Tech did not make such a motion. Striking an expert witness is reserved for extreme cases and is particularly inappropriate when the scheduling order could have been modified to accommodate any issues. *See, e.g., Freeland v. Amigo*, 103 F.3d 1271, 1276-77 (6th Cir. 1997) (holding that the "drastic sanction of preclusion of expert witnesses" was not warranted based on failure to furnish discovery by the discovery deadline, when the deadline could have been shifted).

trays and quench assemblies, loading of new catalyst, and installation of new distribution trays and quench assemblies as well as an American Petroleum Institute (API) 510 inspection.

• Two void spaces that measured 1 inch by 3/4 inch in the bed 3 support grid allowed migration of catalyst and support balls into the quench and distribution trays above bed 4. In both of these void spaces, rope gasket packing had not been properly installed during the January 2005 turnaround.

• The unusually high [change in pressure] across bed 4 following the January turnaround resulted from plugging of the quench and distribution trays located immediately above bed 4 with catalyst and support balls.

• Ergon requested Cat Tech to perform catalyst handling work during the unplanned February 2005 outage for HPU reactor D-651. A mistake during catalyst handling such as failure to remove sufficient quantities of dust and fines from the recovered catalyst, inadvertent blending of collected dust and fines with recovered catalyst, or improper operation of the dense loader resulted in the deposition of a layer of dust and fines in the lower portion of catalyst bed 3. This layer caused an unusually high [change in pressure] across the catalyst bed following the February outage.

• Because of this high [change in pressure], Ergon could only produce the desired product slate at reduced rates on the heaviest feedstock.

• Arbitration damages awarded to Ergon resulted from the work performed by Cat Tech.

(Docket Entry No. 59, Ex. 1 at 3).

Cat Tech objects that "Buehler's testimony is either a restatement of the facts or an attempt to change the 'actual facts' that have been established" in the arbitration and does not assist the trier of fact in determining any issue. (Docket Entry No. 50 at 4-5). The plaintiffs respond that Buehler's testimony is helpful to explain the "highly complex and technical facts" involved in determining

17

"what work Cat Tech performed and the scope of its work," which was the subject of the arbitration award.  (Docket Entry No. 54 at 3).

Buehler's report is relevant and helpful to a layperson in understanding the meaning of technical terms used in the documents to describe the work Cat Tech performed for Ergon and the technical processes involved in carrying out that work.  Buehler's expertise in the area of catalyst change-out services is helpful in explaining the work process Cat Tech undertook and explaining what parts of the reactor were damaged.  Buehler's testimony is admissible to this extent.[5]  This court has not, however, relied on Buehler's report to interpret the policy or to reach any conclusions that are inconsistent with the arbitration award.

### III.     The Motion for Summary Judgment on the Policy Exclusions

The plaintiffs have moved for summary judgment on the grounds that coverage is precluded by the "your product" and "your work" exclusions in the insurance policies.

### A.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the

---

[5]   As it did in moving to strike Martin's report, Cat Tech has argued that Buehler's report should be barred because he was not made available for deposition before Cat Tech's expert designation deadline.  The argument fails for the reasons already discussed.

nonmovant's case.  *Exxon Corp. v. Oxxford Clothes XX, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997).

If the moving party fails to meet its initial burden, the motion for summary judgment must be

denied, regardless of the nonmovant's response.  *United States v. $92,203.00 in U.S. Currency*, 537

F.3d 504, 507 (5th Cir. 2008).

      When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a

motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v.

Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and

designate specific facts showing that there is a genuine issue for trial.  *See id.*  The nonmovant must

do more than show that there is "some metaphysical doubt as to the material facts." *Little v. Liquid

Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  "The mere existence of a scintilla of

evidence in support of the plaintiff's position will be insufficient; there must be evidence on which

the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

(1986).  In deciding a summary judgment motion, the court reviews the facts drawing all reasonable

inferences in the light most favorable to the nonmovant.  *Id.* at 255; *Marathon E.G. Holding Ltd. v.

CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir. 2010).

      **B.**    **Interpreting Insurance Contracts under Texas Law**

      The parties do not dispute that Texas law applies.  In interpreting an insurance policy, a court

applies the rules for interpreting contracts generally, reading all parts of the document together and

exercising caution not to isolate particular sections or provisions.  *Provident Life & Accident Ins.

Co. v. Knott*, 128 S.W.3d  211, 216 (Tex. 2003).  Viewing the contract in its entirety allows a court

to give effect to the written expression of the parties' intent.  *Id.* (citing *Tex. Farmers Ins. Co. v.

Murphy*, 996 S.W.2d 873, 879 (Tex. 1999)); *accord Mid-Continent Cas. Co. v. Swift Energy Co.*,

206 F.3d 487, 491 (5th Cir. 2000); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 748 (Tex. 2006). The parties' intent "is governed by what they said, not by what they *intended* to say but did not." *Id.* at 746. The terms used in an insurance contract are given their commonly understood or generally accepted meaning unless otherwise defined in the policy. *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007).

A court construes an unambiguous policy as a matter of law. *Fiess*, 202 S.W.3d at 746. If a policy provision is uncertain or doubtful or is susceptible to more than one reasonable interpretation, it is ambiguous. *Id.*; *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). An ambiguity does not arise simply because the parties offer opposing interpretations. *Fiess*, 202 S.W.3d 746. A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003).

The insured initially has the burden to plead and prove that the benefits sought are covered by the insurance policy at issue. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008). The insurer bears the burden of establishing that one of the policy's limitations or exclusions constitutes an avoidance or affirmative defense to coverage. *See id.* at 404. Once the insurer demonstrates that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *See Century Surety Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir. 2009).

"The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Admiral Ins. Co. v. Ford*,

--- F.3d ----. 2010 WL 2026699, at *2 (5th Cir. 2010) (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex.2004)). If, however, the language is susceptible to only one reasonable interpretation and can be given definite meaning within the policy as a whole, such exclusion is unambiguous as a matter of law. *Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.*, 359 F.3d 770, 776 (5th Cir. 2004); *see also Travelers Lloyds Ins. Co. v. Pacific Employers Ins. Co.*, 602 F.3d 677, 681 (5th Cir. 2010) ("Under Texas law, insurance policies and indemnity agreements are contracts, and the general rules of contract interpretation apply. An insurance policy's terms are unambiguous if they have definite and certain legal meaning. If the terms are unambiguous, the court must enforce the policy according to its plain meaning. The parties' disagreement regarding the extent of coverage does not create an ambiguity.").

Whether an insurer has a duty to defend the insured is distinct from whether the insurer has a duty to indemnify the insured. *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009). Although Texas courts had previously held that because the duty to defend is broader than the duty to indemnify, if there was no duty to defend, there was no duty to indemnify, the Texas Supreme Court recently held that the duty to indemnify is independent from the duty to defend and an insurer may have a duty to indemnify even if a duty to defend never arises. *Id.* at 744. The duty to indemnify "depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy." *D.R. Horton-Tex., Ltd.*, 300 S.W.3d at 744. Typically, the court considering the coverage dispute will consider evidence needed to establish whether there was coverage in the underlying suit, particularly if the underlying case is resolved without a trial on the merits. *Id.*; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008) (holding that the trial court can consider evidence regarding facts required to determine coverage that were not adjudicated in the underlying

litigation).  The trial court is authorized to make factual findings necessary to resolve coverage.  *See Puget Plastics Corp.*, 532 F.3d at 404.

    **B.**    **Analysis**

        **1.**    **The "Your Product" Exclusion**

The "your product" exclusion excludes coverage for "'[p]roperty damage' to 'your product' arising out of it or any part of it."  (Docket Entry No. 57, Exs. 2 at 25; 3 at 132).  "Your product" is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . [y]ou."  (*Id.*, Exs. 2 at 35-36; 3 at 148-49).  The Fifth Circuit has held that the language of an identical "your product" exclusion is unambiguous under Texas law.  *Valmont Energy*, 359 F.3d at 776 ("Because we find that the 'your product' exclusion is susceptible to only one reasonable interpretation and can be given definite meaning within each policy as a whole, such exclusion is unambiguous as a matter of law.").  The exclusion must be interpreted as a matter of law and given its plain meaning.

There is no evidence in the record that Cat Tech manufactured, sold, distributed, or disposed of any products, goods, or materials it used to service the Ergon reactor or that were damaged.  The record shows that Ergon supplied the catalyst.  It is unclear which entity supplied the internal reactor parts, such as the distribution trays, that Cat Tech installed as part of its service work.  It is also unclear which entity supplied the rope packing that the arbitrators found Cat Tech had improperly installed.  The plaintiffs have not shown that any of the property damage at issue was to goods or products that Cat Tech manufactured, sold, or disposed of.

The plaintiffs argue that the "your product" exclusion applies to the "rendition of services and the materials handled while the service was being rendered."  (Docket Entry No. 57 at 7).  The plaintiffs rely primarily on *United States Fire Ins. Co. v. Massey Irrigation & Liquidation, Inc.*, 40

22

F.3d 385, 1994 WL 652250 (5th Cir. 1994) (per curiam) (unpublished), for this proposition.  In that

case, the insurer argued that it had no duty to defend or indemnify because of a "products-completed

operations hazard" exclusion in the policy.[6]  The policy defined the "products-completed operations

hazard" as injuries "occurring away from premises you own or rent arising out of "'your product'

or 'your work.'"  The  "your product" and "your work" provisions were similar to those in present

case.  *Id.* at *1.  Applying Texas law, the Fifth Circuit rejected the insured's argument that

"providing services, such as repairs, does not constitute a defective product and thus does not fall

within the 'products-completed operations hazard' exclusion."  *Id.* at *2.  *Massey* in turn relied on

*Green v. Aetna Insurance Company*, 349 F.2d 919 (5th Cir. 1965), and *Pan American Insurance*

*Company v. Cooper Butane Company*, 300 S.W.2d 651 (Tex. 1957), which the plaintiffs also cite.

In *Green*, 349 F.2d at 923, the Fifth Circuit found no coverage under a "products hazard" exclusion

for injuries suffered when a drill collar repaired by the insured later broke.  The exclusion defined

"products hazard" to mean: (1) "goods or products manufactured, sold, handle [sic] or distributed

by the named insured or by others trading under his name . . . if the accident occurs after possession

of such goods or products has been relinquished to others by the named insured or by others trading

under his name and if such accident occurs away from premises owned, rented, or controlled by the

named insured"; and (2) "operations, if the accident occurs after such operations have been

completed or abandoned and occurs away from premises owned, rented or controlled by the named

insured; provided, operations shall not be deemed incomplete because improperly or defectively

performed or because further operations may be required pursuant to an agreement . . . ."  *Id.* at 921

n.9.  Disagreeing with a line of cases from other jurisdictions, the Fifth Circuit held that these two

---

[6]   The products-completed operations hazard in the policies at issue in this case is not a separate exclusion
from, or grant of, coverage.

provisions were independent of each other.   "Operations" coverage under (2) was not limited to a product manufactured, sold, handled, or distributed under the "goods or products" coverage of (1). "Occurrences" taking place after operations had been completed were excluded from coverage even though the operations were not tied to the sale, manufacture, or handling of goods or products.   *Id.* at 923.   The court found it unnecessary to pass on the insured's argument that to "work on" goods did not amount to "handling" within the meaning of (1).   In *Cooper Butane*, 300 S.W.2d at 655, the Texas Supreme Court held that a "completed operations" exclusion excluded coverage for injuries arising out of a gas valve the insured had improperly repaired.   Although the *Cooper Butane* court did not directly analyze this issue, the Fifth Circuit stated that *Cooper Butane* "implicitly held that 'operations' need not be tied to a product which is manufactured, sold, handled or distributed by the insured in order to make the 'completed operations hazard' exclusion operative."   *Massey*, 40 F.3d 385, 1994 WL 652520, at *3.   The *Massey* court concluded that "under Texas law the completed operations hazard includes rendition of services."   *Id.*

This conclusion, however, is not the same as holding that the "your product" exclusion covers the insured's rendition of services.   The definition of "products-completed operations hazard" in this case and in *Massey* includes both damage arising out of "your product" and "your work." The *Massey* court's conclusion did not address the "your product" exclusion.   In *Massey* — and the earlier cases it cited — the "completed operations hazard" exclusion covering damage arising out of both "your product" and "your work" included the rendition of services regardless of whether those services were tied to buying, selling, or handling a product.   In *Green*, the Fifth Circuit explicitly avoided the insured's argument that "to 'work on' goods such as the drill collar here does not amount to goods 'handled'" under the "your product" exclusion.   Instead, because the occurrence arose out of the insured's work, it could be excluded on that basis alone.   *Green*, 349

24

F.2d at 923.     The plaintiffs' argument is also that, regardless of whether rendering services can be a "product" under the "your product" exclusion from coverage for "property damage," Cat Tech "handled" all Ergon's damaged goods or products when performing its work.  Cat Tech responds that, under the doctrine of *noscitur a sociis* ("a word is known by the company it keeps"), "handled" means something similar to "manufactured, sold distributed, or disposed of." (Docket Entry No. 60 at 6); *see also In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 218-19 (5th Cir. 2007) ("Under the canon of *noscitur a sociis*, a term is interpreted by considering the meaning of the terms associated with it.").  The plaintiffs argue that this interpretation is invalid because it would make the word "handled" surplusage.  They argue that the "everyday meaning" of the word, which is "to try or examine with the hand," should be applied.  (Docket Entry No. 62 at 4).  But the Fifth Circuit has held that "the verb 'handled' as used in [the 'your product'] exclusion [] means 'to deal or trade in' rather than 'to touch.'"  *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 420 (5th Cir. 1982); *accord Gulf Mississippi Marine Corp. v. George Engine Co., Inc.*, 697 F.2d 668, 672 (5th Cir. 1983).  Although the *Todd Shipyards* court was faced with a Louisiana insurance case, it reached this conclusion without reference to Louisiana law.  Instead, the court adopted the analysis of a treatise and two state supreme courts, reasoning that one of *Webster's Dictionary's* definitions of "handle" as "to buy and sell; to deal, or trade in" was more consistent with contractual intent than the alternate definition of "to touch."  *Id.* at 419-20. (quotations removed); *see also* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 550 (1990) (stating that one definition of the verb "handle" is "to engage in the buying, selling, or distributing of").  "That the intention of the insurer was to restrict the word 'handled' to this meaning is apparent from the words 'manufactured, sold or distributed,' with which it is linked."  *Todd Shipyards*, 647 F.2d at 420 (quotations and alterations

removed).   The court only turned to Louisiana law as an alternate route to reach this same conclusion.  *Id.*

Courts in other jurisdictions have agreed with the Fifth Circuit's interpretation of "handled." *See, e.g., American Home Assurance Co. v. AGM Marine Contractors, Inc.*, 467 F.3d 810, 814 & n.3 (1st Cir. 2006) (citing and distinguishing *Gulf Mississippi Marine* because the insured "was responsible for procuring the docks and providing them in their final form"); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Structural Sys. Tech., Inc.*, 756 F.Supp. 1232, 1239 (E.D. Mo. 1991), *amended on other grounds by* 764 F.Supp. 145 (E.D. Mo.1991)), *aff'd*, 964 F.2d 759 (8th Cir. 1992) (defining handled as "to deal or trade in" rather than "to touch"); *see also Hydro Systems, Inc. v. Continental Ins. Co.*, 929 F.2d 472, 475 (9th Cir. 1991) (holding that gas liberated by the insured's manufacturing process was not the insured's "product" because it did not fit the "common sense" definition of products as "goods or services which the insured deals in as his stock or trade; stating that the term "disposed of" in the policy's definition of "your product" did not "detract from the generally understood meaning of the term 'product'").  In this case, the Fifth Circuit definition precludes the insurers' proposed interpretation of the "your property" exclusion.

There is no evidence in the record that Cat Tech bought, sold, dealt, traded in, or supplied any of the materials it used in performing its work on the Ergon reactor.  On the present record, it cannot be said as a matter of law that the "your product" exclusion applies.

## 2.    The "Your Work" Exclusion

The policies exclude coverage for "'[p]roperty damage' to 'your work' arising out of it or any part of it *and* included in the 'products-completed operations hazard.'"  (Docket Entry No. 57, Exs. 2 at 25; 3 at 132 (emphasis added)).  The policies define "your work" as "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection

with such work or operations," including warranties or representations about "your work." (*Id.*, Exs. 2 at 36; 3 at 149).  The "products-completed operations hazard" is defined to mean  all "'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) Products that are still in your physical possession; or (2) Work that has not yet been completed or abandoned." (*Id.*, Exs. 2 at 35; 3 at 147).  Work is "deemed completed at the earliest of . . . [w]hen all of the work called for in your contract has been completed," and "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

The parties agree that the arbitration award was based on property damage occurring away from Cat Tech's premises and arising out of its "work." (*See* Docket Entry Nos. 57 at 9-11; 60 at 10).  The definition of products-completed operations hazard clearly includes services rendered. *See Massey*, 40 F.3d 385, 1994 WL 652250, at *2-3.  Although the parties agree that the damage to the Ergon reactor arose out of Cat Tech's "work,"as the products-completed operations hazard definition requires, they dispute whether the damage was *to* Cat Tech's work, as the "your work" exclusion requires.

A recent Fifth Circuit opinion based on Texas law applying an exclusion identical to the "your work" exclusions in the American Home and National Union Policies illustrates this distinction.  In *Wilshire Insurance Co. v. RJT Construction, LLC*, 581 F.3d 222, 226 (5th Cir. 2009), the court held that the "your work" exclusion precluded coverage for damage to the parts of a house the insured worked on, but did not preclude coverage for damage to other parts of the house that the insured did not work on, even if those other parts were damaged as a result of the insured's faulty work.  The court explained that this exclusion prevents a CGL policy from "morphing into a performance bond covering an insured's own work." *Id.* at 226.

27

In the underlying litigation in *Wilshire Insurance*, the plaintiff alleged that the insured contractor had negligently repaired the house's foundation in 1999 after a water leak, causing cracks in the walls and ceilings that appeared in 2005.  *Id.* at 224.  The insured sought a defense based on the CGL policy, and the insured sued in federal court for a declaratory judgment of no coverage. The court held that the "your work" exclusion applied to preclude coverage for the cost of repairing and replacing the insured's foundation but did not exclude coverage for damage to other property as a result of the defective work.  *Id.* at 226; *see also Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 655 (Tex. 2009) ("[C]laims of faulty workmanship by [the insured] are excluded from coverage under the 'your work' exclusion.").  The damage to the walls and ceilings fell under the products-completed operations hazard because it *arose out of* the insured's work,[7] but it did not fall under the "your work" exclusion because it was not damage *to* the insured's work. The court equated damage to the insured's work to damage to the part of the house on which the insured worked.  *See Wilshire Insurance*, 581 F.3d at 226-227.

The *Wilshire Insurance* court relied on *Travelers Insurance Company v. Volentine*, 578 S.W.2d 501, 503 (Tex. Civ. App.–Texarkana 1979).  In that case, the insured was an auto mechanic who had repaired the valves on a customer's engine.  The mechanic only worked on the valves.  In the underlying suit, the customer claimed that "by reason of defective performance of the work a valve keeper failed to function, resulting in the destruction of the entire engine."  *Id.* at 502-03.  The court held that the "your work" exclusion precluded coverage for replacing the valves because the insured had worked on them.  The exclusion did not preclude coverage for damage or destruction for other parts of the engine allegedly resulting from the work on the valves.  *Id.* at 504.

---

[7]  The *Wilshire Insurance* court did not explicitly address whether the products-completed operations hazard definition was satisfied.

28

Cat Tech's work in January 2005 "consisted of unloading all catalyst from Beds 1 through 4, removal of existing reactor internals, installation of new reactor internals, and the loading of new catalyst in each of the Beds."  (Docket Entry No. 57, Ex. 1 at 2-3).  The arbitration panel found that Cat Tech's failure to do this work properly "among other things, caused the damage to the Bed 3 reactor internals, migration of catalyst from Bed 3 into Bed 4, and damage to some of the catalyst." (*Id.*).  The arbitration award made a passing reference to "other things" on which Cat Tech worked in January 2005 that were damaged besides the Bed 3 reactor internals.  But later in the award, the arbitrators clarified that the damage was also to Bed 4 from the migration of catalyst and to some of the catalyst itself.  (*Id.*, Ex. 1 at 3).   In this case, unlike in *Wilshire Insurance,* there is no distinction between the parts of the structure that the insured worked on and the parts of the structure that were allegedly damaged as a result of the insured's faulty work.  The parts of the reactor on which Cat Tech worked were the parts that were allegedly damaged as a result of that faulty work. That damage was to Cal Tech's "work" and was the basis of the arbitration award.  Because "your work" includes "[m]aterials, parts or equipment furnished in connection with such work or operations," the damaged reactor internals and catalyst were Cat Tech's "work."  The damages awarded were for the parts of the reactor on which Cat Tech performed its faulty work.  In January 2005, Cat Tech replaced the reactor internals and loaded the beds with new catalyst.  The work performed in February 2005 in part redid the work that had been improperly done in January 2005. The October 2005 repair work on the reactor internals, including on the components of the distribution and quench trays, was intended to restore them to the state that Cat Tech had been hired to leave them in January.

As noted, this is not a case like *Wilshire Insurance,* in which the insured's faulty workmanship in the home foundation caused damage to the walls and ceiling, or *Volentine*, in which

the insured's faulty valve repair caused damage to the entire engine.  The damage to the reactor in January 2005 was to the parts of the reactor on which Cat Tech performed its work.  (*See* Docket Entry No. 59, Ex. 1 at 5-6).  There is nothing in the record indicating that other parts of the reactor, on which Cal Tech did not work, were damaged from Cat Tech's January 2005 work.

The damage resulting from Cat Tech's February 2005 effort to correct its earlier defective work was also damage to Cat Tech's work.  In February 2005, "Cat Tech unloaded catalyst from Beds 1, 2, 3, and part of Bed 4; Cat Tech screened the removed catalyst; Cat Tech removed the damaged reactor internals and reinstalled the repaired internals; and Cat Tech loaded the screened catalyst along with a limited amount of new catalyst to make up for [] the amounts lost in the screening process." (Docket Entry No. 57, Ex. 1 at 3).  The pressure dropped in Bed 3 immediately after this work was completed.  Again, the arbitration panel found that this was the result of faulty workmanship.  As a result, Ergon ultimately hired another contractor to redo Cat Tech's work to address the excessive pressure drop that had occurred in Bed 3 during Cat Tech's work.  There is nothing in the record suggesting that the damage extended beyond the bed and catalyst assembly on which Cat Tech worked.

The "your work" exclusion precludes coverage under Cat Tech's insurance policies.  Summary judgment is appropriate on this basis.  Cat Tech's cross-motion for summary judgment that it is entitled to indemnity under the products-completed operations hazard, (Docket Entry No. 60), is denied.  In *Valmont Energy*, 359 F.3d at 776, the Fifth Circuit rejected the argument that the definition of products-completed operations hazard creates additional coverage. Cat Tech's motions for partial summary judgment that the arbitrators awarded damage for "property damage" and two "occurrences" are denied as moot.

**IV.    Conclusion**

The plaintiffs' motion for summary judgment is granted.  The plaintiffs have no duty to indemnify Cat Tech for the arbitration award.  Cat Tech's motions for partial summary judgment are denied as moot.  Cat Tech's motion to exclude Martin's expert testimony is granted in part and denied in part and its motion to exclude Buehler's expert testimony is denied.  No later than **June 25, 2010**, the parties must file a statement identifying any issues remaining to be decided and proposing a scheduling order for resolving them or submitting a proposed order of final judgment.

SIGNED on June 9, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

31